United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 18, 2023
Nathan Ochsner, Clerk

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 21-31087 |
| MAGELLAN E & P HOLDINGS, INC., | § | |
| | § | CHAPTER 7 |
| Debtor. | § | |
| | § | |
| RONALD J. SOMMERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | ADVERSARY NO. 22-3183 |
| | § | |
| OFFSHORE MARINE CONTRACTORS, INC., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

No business entity happily returns hard earned funds that it collected prepetition, especially when additional monies remain due. However, that is what the Chapter 7 Trustee is seeking is this case. The Chapter 7 Trustee is requesting that the Court avoid and recover a payment in the amount of $269,995.67 made to Offshore Marine Contractors, Inc. by the debtor, Magellan E & P Holdings, Inc., as a preferential transfer pursuant to 11 U.S.C. §§ 547 and 550. The Chapter 7 Trustee is also objecting to the filed claim of Offshore Marine in the amount of $306,137.89 ("POC No. 3"), pursuant to 11 U.S.C. § 502.

At issue in this trial held on August 14, 2023, was whether the one payment of $269,995.67 paid to Offshore Marine Contractors, Inc. ("Defendant" or "Offshore Marine") by Magellan E&P Holdings, Inc. ("Debtor") was property of the estate and therefore avoidable as a preferential transfer. For the following reasons, the Court grants judgment in favor of the Chapter 7 Trustee, orders Offshore Marine to pay Ronald J. Sommers, Trustee the amount of $269,995.67 plus pre-

judgment interest at a rate of 5.34%, and disallows POC No. 3, until such amount is paid to the estate.

## PROCEDURAL HISTORY

On March 30, 2021, Debtor filed a voluntary petition in this Court under Chapter 7 of Title 11 of the United States Code, which is still pending. On March 31, 2021, Ronald J. Sommers was appointed as Chapter 7 Trustee of the Debtor's estate. This adversary was filed on June17, 2022 by Ronald J. Sommers, Chapter 7 Trustee ("Trustee") against Offshore Marine to avoid and recover transfers pursuant to 11 U.S.C. §§ 547 and 550 and to disallow claims pursuant to 11 U.S.C. § 502.[1] Defendant filed an answer to the Complaint on July 13, 2022[2] and an Amended Answer to Complaint on May 5, 2023.[3] Trial was held on August 14, 2023.[4]

## FACTS

Prior to March 30, 2021, Debtor owned a 100% working interest in well MU-921, located in the Mustang Island Block off the Texas coast in the Gulf of Mexico. On August 31, 2020, well MU-921 experienced a blowout, or a well-control event. As part of its efforts to control the well, the Debtor chartered vessels from Offshore Marine, which owns and operates vessels in service of the oil and gas industry in the Gulf of Mexico. On October 7, 2020, Debtor and Defendant entered into a Master Time Charter Agreement under which Defendant would charter vessels to Debtor in order to service the well blowout. At all times material, Debtor had in full force and effect a policy of insurance being Unique Market Reference or UMR B1180DQ0068 underwritten through

---

[1] ECF No. 1.
[2] ECF No. 7.
[3] ECF No. 15.
[4] ECF No. 32.

Lloyd's of London.[5] The lead underwriter on Debtor's insurance was Antares Managing Agency, Limited (Syndicate number 1274).

On February 19, 2021, and February 22, 2021, Debtor received two payments of $2,412,500 each [total of $4,825,000] from its insurance provider to be used for the payment of expenses incurred due to the well blowout. The funds were deposited into Debtor's Chase bank account and commingled with other funds of Debtor. While Debtor was instructed by the insurance provider to use the funds to pay vendors for the well blowout, the decision on who to pay, when to pay, and how much to pay was under the exclusive control of Debtor. While all the parties testified that they had the expectation that the insurance company would provide sufficient funds to pay all the well blowout expenses, this expectation was never legally documented in a sufficient way to determine that the funds received by Debtor were earmarked for the vendors.

It was uncontested that the Debtor was insolvent at all times relevant to this proceeding, and that the Trustee timely filed its complaint to avoid and recover transfers pursuant to 11 U.S.C. §§ 547 and 550 and to disallow claims pursuant to U.S.C. § 502. The Trustee and Offshore Marine have stipulated that the Trustee has met his burden under 11 U.S.C. § 547(b) if the Court finds that the funds are property of the estate, if the transfer diminished the value of the bankruptcy estate.[6] The testimony confirmed that Debtor paid Defendant the sum of $269,995.67 from Debtor's Chase bank account ending in 5897 in February of 2021, and Offshore Marine received those funds. The evidence also showed that the payment to Defendant was for or on account of an antecedent debt owed by Debtor before the payment was made, and that the payment was in satisfaction of the following invoices: invoice number 26632 dated October 31, 2020, for $37.125.00, invoice

---

[5] ECF No. 29. ("There is a separate ongoing lawsuit (Civil Action No. 4:21-cv-00904; *Antares Underwriting Limited v. Magellan E&P Holdings, Inc.*").
[6] ECF No. 27, page 8.

number 26640 dated November 30, 2020, for $172,859.00, and invoice number 26663 dated January 13, 2021, for $60,011.67. The payment to Offshore Marine, a non-insider, was made within 90 days before the bankruptcy petition.

## JURISDICTION

The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) and (b), and the standing order of reference from the District Court. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2). The bankruptcy court has the power to enter a final judgment in this adversary proceeding, subject to traditional rights of appeal. This adversary proceeding arises under bankruptcy case number 21-31087 (the "Main Case") pending in this District and venue is proper pursuant to 28 U.S.C. § 1409. In addition, the parties have stipulated that the Court has jurisdiction.[7]

## LEGAL ANALYSIS

**Count I: Avoidance of Preferential Transfers from Debtor to Defendant Pursuant to 11 U.S.C § 547(b)**

Bankruptcy law allows a trustee to avoid any transfer of an interest of the debtor in property if the transfer was to or for the benefit of the creditor; the payment was for or on account of an antecedent debt owed by the debtor before the payment was made; the payment was made while the debtor was insolvent; the payment was made within ninety days before the date of the bankruptcy petition, or within one year if the recipient is an insider of the debtor; and the payment enables the creditor to receive more than the creditor would receive if the case was a Chapter 7 case, the transfer had not been made, and the creditor received payment of its claim through the chapter 7 distribution.[8] The burden of proof falls on the trustee to prove each of these elements.

---

[7] ECF No. 27.
[8] 11 U.S.C. § 547(b).

For a preference to be voided under § 547, "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished."[9] The essential question and initial determination in all cases brought under Section 547, as this one is, is thus whether the payments made were from property of the Estate.

The Court finds that the transfer to Offshore Marine was a preference and the elements are met. The transfer on February 25, 2021, of $269,995.67 was for the benefit of a creditor, the Defendant. The payment was for or on account of an antecedent debt owed by Debtor before the payment was made as it was in payment of three invoices: invoice number 26632 on October 31, 2020, for $37,125.00 paid one hundred and seventeen days later, invoice number 26640 on November 30, 2020, for $172,859.00 paid eighty seven days later, and invoice number 26663 dated January 13, 2021, for $60,011.67 paid forty three days later. The last invoice is telling because while Defendant had previously invoiced monthly, it began to invoice biweekly based on a fear on not being paid. The payment was also made while the Debtor was insolvent as the parties stipulated, but it was also clear from the evidence. Additionally, the payment was made within 90 days before the date of the bankruptcy petition in this case to Offshore Marine, a non-insider. Finally, the payment enables the Defendant, a creditor, to receive more that it would have received if the case was a Chapter 7 (which it is), the transfer had not been made, and the creditor received payment of its claim through the Chapter 7 distribution. The total amount of claims in Debtor's Chapter 7 proceeding is $131,591,112.07[10] while Debtor's assets at the time of filing totaled only $11,147,601.11, including a cash balance of $980,964.95.[11] This is a deficit of $120,443,511. Given these amounts, the transfer of $269,995.67 to Offshore Marine certainly enables Defendant

---

[9] *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1355-1356 (5th Cir. 1986), citing *Genova v. Rivera Funeral Home* (*In re Castillo*), 39 Bankr. 45, 46 (Bankr.D.Colo.1984).
[10] Claims Register, Case No. 21-31087, *In re Magellan E&P Holdings, Inc.*
[11] Case No. 21-31087, ECF No. 31-10.

to receive more that it would have, if it received payment of its claim through the Chapter 7 distribution.

While the Bankruptcy Code provides several defenses to a preference action, none of the defenses pled by Offshore Marine allow the non-avoidability of the transfer in this case to the Defendant. The Defendant's argument that the property transferred was not property of the estate fails. The February 19, 2021, and February 22, 2021, payments of $2,412,500 each [total of $4,825,000] are property of the estate pursuant to 11 U.S.C. § 541. The term "interest of the debtor in property" is not defined by the Bankruptcy Code, but the Supreme Court has interpreted the term to mean "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[12] Ultimately, the Supreme Court held that the term "interest of the debtor in property" under § 547(b) is synonymous with the term "property of the estate" under § 541.[13] Courts generally look to state law to determine whether property is an asset of the debtor.[14] The Debtor controlled these funds, and the funds were commingled with other funds of the Debtor. Assuming the funds were to be used exclusively for the payment of vendors for the well blowout, the decision of who to pay, when to pay, and how much to pay was still under the exclusive control of the Debtor. "[C]ontrol over funds in an account is the predominant factor in determining an account's ownership."[15] "[T]he primary consideration in determining if funds are property of the debtor's estate is whether the payment of those funds diminished the resources from which the debtor's creditors could have sought payment."[16] Here it is undisputed that the payment made by Magellan to Offshore Marine diminished the funds in

---

[12] *Diamond Offshore Co. v. Bennu Oil & Gas, LLC* (*In re ATP Oil & Gas Corp.*), 540 B.R. 294, 304 (Bankr. S.D. Tex. 2015) (quoting *Begier v. I.R.S.*, 496 U.S. 53, 58, 110 S. Ct. 2258, 2263, 110 L. Ed. 2d 46 (1990)).
[13] *Id.*
[14] *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (U.S. 1979).
[15] *De La Pena Stettner v. Smith* (*In re IFS Fin. Corp.*), 669 F.3d 255, 262 (5th Cir. 2012).
[16] *Id.* at 263.

Magellan's estate for payment pro rata to all creditors. The funds were "an interest of the debtor in property" because it was property of Debtor's estate, meaning "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings."[17] Additionally, the funds were held in a commingled account that could have been used to pay other creditors presumptively constitutes property of the estate.[18]

Further, the Defendant's argument that the funds were earmarked for payment to the Offshore Marine also fails. Earmarking is a unique defense that should only be applied sparingly, "as a judicially created exception to a statutory rule, the earmarking defense must be narrowly construed."[19] The Fifth Circuit has described the earmarking doctrine in the context of a preference action as requiring several factors:

> For the preference to be voided under § 547, it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished. If all that occurs in a "transfer" is the substitution of one creditor for another, no preference is created because the debtor has not transferred property of his estate; he still owes the same sum to a creditor, only the identity of the creditor has changed. This type of transaction is referred to as "earmarking" . . . . The earmarking doctrine is widely accepted in the bankruptcy courts as a valid defense against a preference claim, primarily because the assets from the third party were never in the control of the debtor and therefore payment of these assets to a creditor in no way diminishes the debtor's estate.[20]

The facts present here are very similar to the *In re Entringer Bakeries* case, where the Fifth Circuit held that because the debtor exercised control and could choose who to pay once the funds were in its account, the earmarking defense was precluded:

> As noted above, the money became Entringer's property on April 12 when Whitney deposited it into Entringer's general account, and Entringer paid FBT a day later. This fact makes the case distinguishable from *Coral Petroleum*, where the debtor never once had any control over the money. Instead of a simultaneous bookkeeping

---

[17] *Diamond Offshore Co. v. Bennu Oil & Gas LLC*, *supra*.
[18] *Id*. at 306.
[19] *Campbell v. Hanover Ins. Co.* (*In re ESA Envtl. Specialists*), 709 F.3d 388, 394 n.5 (4th Cir. 2013).
[20] *Caillouet v. First Bank & Tr.* (*In re Entringer Bakeries Inc.*), 548 F.3d 344, 348 (5th Cir. 2008)(quoting *Coral Petroleum, Inc. v. Banque Paribas-London*, 797 F.2d 1351, 1355-56 (5th Cir. 1986)).

    transaction as in *Coral Petroleum*, here the money remained in Entringer's account until Entringer chose to write a check to FBT the day after receiving the funds from Whitney. Additionally, Entringer never stipulated to FBT that it would use the Whitney money to pay the FBT loan, unlike the facts in *Coral Petroleum*, where Coral told Paribas-Suisse to use the incoming money to satisfy Coral's debt.[21]

The Fifth Circuit in *Entringer* plainly holds that control over the funds in a bank account, along with the use of funds to pay creditors the debtor chooses to pay, is dispositive of the earmarking defense.[22] Furthermore, the *Entringer* court also holds that control is even more dispositive where there is no express agreement among the three parties (the new creditor, old creditor, and debtor), "Although physical control is not the sole indicator of whether the parties earmarked the money for a particular creditor, it is particularly relevant given that there was no agreement among Entringer, Whitney, and FBT that Entringer would use the money to pay off FBT."[23] Defendant does not allege and cannot show that there was any three-way agreement between Magellan, Antares, and Offshore Marine.

    Under the facts, there could be no earmarking, and there is no evidence (i.e. a note or requirement of repayment) to indicate that the insurance proceeds were a note. Additionally, "the earmarking doctrine applies only when the debtor borrows money from one creditor and the terms of that agreement require the debtor to use the loan proceeds to extinguish specific, designated, existing debt."[24] The earmarking doctrine does not apply where the debtor designates the recipient of the transferred funds.[25] "The earmark rule requires that the party making the loan choose the recipient of the funds."[26] There is nothing in the record that evidences Debtor's insurers directing that any of the insurance proceeds be paid to Defendant, and there is dispositive evidence that

---

[21] *Id.* at 350.
[22] *Id.*
[23] *Id.*
[24] *Campbell v. Hanover Ins. Co. supra* at 396.
[25] *Bank of America, N.A. v. Mukamai* (*In re Egidi*), 571 F.3d 1156, 1160-61 (11th Cir. 2009).
[26] *Hunter v. Society Bank & Trust* (*In re Parker Steel*), 149 B.R. 834, 853 (Bankr. N.D. Ohio 1992).

shows Debtor alone chose which vendors to pay and in which amounts. There simply was a standard reservation of rights made by the insurance company. While all the parties likely had the expectation that an insurance company would pay sufficient funds to pay all the well blow out expenses, this expectation was never legally documented in any sufficient way for the Court to determine that any funds received by the debtor were earmarked.

Defendant's argument that the transfer was in the ordinary course of business also fails. Unfortunately, there is no historical data for transactions between the Debtor and Offshore Marine as this was the one and only transfer from the Debtor to Defendant. Because there is no baseline of dealings, the Court should look to the terms of the parties' contract.[27] Here, the written agreement between Debtor and Defendant called for thirty-day payments, and no payments were made during this time period. "Late payment of a debt has been considered particularly important in determining whether the payment is ordinary" and such late payments "will be considered 'ordinary' only upon a showing that late payments were the normal course of business between the parties."[28] Since this was the first dealing between Defendant and Debtor, the evidence offered was not sufficient to show that payment beyond thirty days was in the ordinary course of business between Debtor and Defendant. Further, the objective test and subjective test don't provide any relief to Offshore Marine, and it has failed in its burden as prove any defenses. The expert testimony of the Trustee does not support any of Defendant's defenses, and Defendant did not call an expert witness.

---

[27] *Jubber v. SMC Elec. Prods.* (*In re C.W. Mining Co.*), 798 F.3d 983, 991 (10th Cir. 2015) ("For first-time transactions, however, 'the court may refer solely to the written terms of the transaction to define the ordinary course of business between the parties.'").

[28] *Logan v. Basic Distribution Corp.* (*In re Fred Hawes Org., Inc.*), 957 F.2d 239, 244 (6th Cir. 1992); *In re Xonics, Inc.*, 1986 Bankr. LEXIS 4716, *8-9 (Bankr. N.D. Ill. 1986) (Late payments under a lease are not subjectively ordinary and "the making of late payments and the receipt of them are not according to ordinary business terms.").

Lastly, there is a strong fairness argument to be made in favor of the Trustee. There were very substantial vendor claims arising from the well blowout. As testified by the Trustee's expert, the claims which were paid out of the insurance proceeds were not made pro rata. Some lucky vendors received 100% of their invoices paid, others received no payment, while others received some portion of their claims. However, the vast majority either were unpaid or only partially paid. Defendant received 46.86% of its outstanding invoices. Bankruptcy should stand for the proposition that all creditors are treated fairly and equally. This is the rational basis behind preference recovery which in theory leads to an equal pro rata distribution to unsecured creditors. Offshore Marine should not be able to retain 46.86% of its invoices under these facts while other creditors were paid zero or amounts much less than 46.86%.

**Count II: Recovery of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)**

Under 11 U.S.C. § 550(a), the Trustee "may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee" from Defendant.[29] The Fifth Circuit held that an initial transferee is one who receives "dominion and control over funds" directly from the debtor.[30] Here, there is no dispute that the funds were wired directly from Debtor's Chase operating bank account into Offshore Marine's bank account. Therefore, the Trustee is entitled to recover from Defendant the sum of $269,995.67.

**Count III: Disallowance of Any Claim of Defendant Pursuant to 11 U.S.C. § 502(d)**

Under 11 U.S.C. § 502(d), the Court shall disallow any claim of any entity that is a transferee of a transfer avoidable under § 547, unless such entity or transferee has paid the estate

---

[29] 11 U.S.C. § 550(a).
[30] *Cullen Center Bank & Trust*, 102 F.3d at 1419 (quoting *In re Coutee*, 984 F.2d 138, 140-41 (5th Cir. 1993)).

the amount for which such entity or transferee is liable under § 550.[31] The Defendant was an initial transferee of the funds at issue and has not paid the estate the amount of the avoidable transfer for which Offshore Marine is liable. Therefore, the Defendant's claim is disallowed until such time as Offshore Marine pays to the estate the amount of $269,995.67.

## CONCLUSION

The Court finds that the transfer of $269,995.67 to Defendant was property of the estate. Therefore, the Court grants judgment in favor of the Trustee and orders Offshore Marine to pay the estate the amount of $269,995.67, plus pre-judgment interest at a rate of 5.34%. Further, the Court finds that Defendant's POC No. 3 is disallowed until such time as Offshore Marine pays to the estate the judgment amount.

The Court will issue a separate Final Judgment.

SIGNED 08/18/2023

Jeffrey Norman
United States Bankruptcy Judge

---

[31] 11 U.S.C. §502(d).